# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MICHELLE AHEE,

            **Plaintiff,**            **CIVIL ACTION NO. 07-cv-12071**

     **vs.**                 **DISTRICT JUDGE ROBERT H. CLELAND**

                          **MAGISTRATE JUDGE MONA K. MAJZOUB**

COMMISSIONER OF
SOCIAL SECURITY,

            **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**RECOMMENDATION:**    Plaintiff's Motion for Summary Judgment (docket no. 18) should be DENIED, and that of Defendant (docket no. 23) GRANTED, and the case dismissed.

***

Plaintiff filed an application for Disability and Disability Insurance Benefits on April 29, 2003, alleging that she had been disabled and unable to work since March 21, 2003 as a result of chronic fatigue syndrome, pes valgus, plantar fasciitis, lower back pain due to injury, chronic neck pain causing migraine headaches and general chronic pain. (TR 55, 63). The Social Security Administration denied benefits. (TR 44-48). A requested *de novo* hearing was held on July 13, 2005 before Administrative Law Judge (ALJ) Henry Perez, Jr. (TR 24-33, 225). The ALJ subsequently found that the claimant was not entitled to a period of disability or Disability Insurance Benefits because she was not under a disability at any time through the date of the ALJ's December 8, 2005 decision. (TR 33). The Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review. (TR 7-9). The parties filed Motions for Summary

Judgment. The issue Plaintiff raises for review is whether the ALJ's decision is supported by substantial evidence on the record.

Plaintiff was born in 1963 and was 42 years old at the time of the ALJ's decision. (TR 33, 55). Plaintiff has a high school education and one year of additional education. (TR 69). Plaintiff last worked at a retail shop from March to April 2005. (TR 229). Plaintiff worked at a jewelry store from November 2004 to February 2005. (TR 228, 230). Plaintiff testified that the job at the jewelry store was seasonal, and she worked from 20 to 38 hours per week. (TR 231). Plaintiff testified that the job required standing, bending and dealing with customers. (TR 228). Plaintiff testified that after a week on the job she became fatigued. (TR 230). Her feet hurt and she had trouble thinking clearly due to her fatigue. (TR 230). She had difficulty waiting on customers and keeping up the level of performance necessary to sell items. (TR 230). She stated that she had anxiety from the crowds at the mall, standing, and the pressure to sell a certain amount of merchandise. (TR 232). She asked her district manager to put her at a slower store and he complied, but she became more fatigued. (TR 232).

Plaintiff also had a job in appliance sales in fall 2004 and the job lasted approximately two weeks. (TR 233). Plaintiff worked at a law firm from 2000 through March 2002. (TR 64, 234). Her duties at the law firm included filing, faxing and sorting and delivering mail. (TR 234). Plaintiff was on her feet most of the time and was able to lift up to twenty pounds. (TR 235). Plaintiff's feet began to hurt when she was at the law firm. (TR 235). Plaintiff had other jobs, but each lasted less than three months. (TR 234).

Plaintiff lives by herself in a second floor apartment. (TR 239). She testified that she does not usually have problems going up the stairs. (TR 239). Her mother gives her food sometimes, but

she otherwise tries to do things on her own. (TR 239). Plaintiff reports that she engages in minimal food preparation because it takes too much energy to cook. (TR 83). She reports that many days she is tired by the time she gets dressed. (TR 83). She does her laundry and cleans her house when she can, and her stamina for these activities is anywhere from five minutes to one hour. (TR 84). Plaintiff reports that she uses the toilet from 10 to 30 times per day due to irritable bowel syndrome. (TR 83). Plaintiff is able to drive. (TR 84).

She testified that her fatigue is the greatest obstacle to working full time. (TR 240). She testified that with the fatigue she has insomnia, her memory is not good, she cannot concentrate, she has anxiety attacks while driving and she suffers chronic upper respiratory infections. (TR 82, 85, 240). Upon questioning by the ALJ Plaintiff testified that she can sit for a couple of hours before she starts falling asleep and has pain in her back and neck and has to take a break to go to the bathroom or eat. (TR 240-41). She can stand for only fifteen to twenty minutes due to pain in her feet and legs. (TR 86, 241). She can lift up to fifteen pounds but also testified that she "might hurt" her back if she lifts more. (TR 242). Plaintiff testified that she could not lift the ten to fifteen pounds on a repetitive basis five or six times an hour in an eight hour day because it would be "too fatiguing" for her. (TR 242). Plaintiff testified that she was being treated for her back over the last "couple of years" but now she just tries to maintain her back with stretching and strengthening exercises. (TR 242). She naps for two or three hours per day and rests (including sleeping) for eight or ten hours per day. (TR 242-43). At the time of the hearing Plaintiff did not have health insurance; she testified that the state "or the country or something" pays for her treatment. (TR 238).


### *Vocational Expert*

The Vocational Expert (VE) testified that Plaintiff's past sales work was semi-skilled and light exertion. The clerical job at the law firm was semi-skilled and light due to her responsibilities in collecting and delivering mail. (TR 244). The VE testified that Plaintiff has some transferrable skills in sales work at the light exertional level and clerical work at the sedentary level. (TR 244). The ALJ asked the VE to consider an individual of Plaintiff's age, education and work experience with the following exertional limitations: (1) limited to lifting twenty pounds occasionally and ten pounds frequently, (2) limited to occasional climbing, balancing, stooping, crouching, kneeling and crawling, (3) jobs providing routine production and stress, simple job assignments and occasional contact with supervision and (4) limited to unskilled work. (TR 245). The VE testified that such an individual could not perform Plaintiff's past work because it demanded more skill than an unskilled classification. (TR 245). The VE testified that such an individual could perform light unskilled work such as hotel and motel housekeepers, maids, school janitors, crossing guards, unarmed security people and monitors and which includes about 8,000 jobs in southeastern Michigan and 12,000 jobs statewide. (TR 246).

The VE testified that if Plaintiff's testimony were credible and the exertional impairments described were supported by medical evidence she could perform sedentary work if she were provided a sit/stand option. (TR 246). The jobs would be the same. However, they would number approximately half as many. (TR 246-47). The VE testified if Claimant's non-exertional limitations were as testified, then she could not do any work. (TR 247). The VE explained that his testimony regarding the jobs and their categorization was consistent with the Dictionary of Occupational Titles. (TR 247). He further explained that the DOT was silent regarding sit/stand options and that testimony was based on his experience. (TR 247-48).

4

### *Medical Evidence*

Plaintiff reports that she treated with Richard Schiappacasse, M.D., from 2001 to April 2003 for her chronic fatigue syndrome, depression, stress, low thyroid and headaches.  (TR 65).  Dr. Schiappaccasse's records are set forth in detail in the analysis below.

Plaintiff treated with Sheldon J. Goldstein, D.P.M., for foot pain.  (TR 66).  Dr. Goldstein prescribed physical therapy and orthotics.  (TR 66).  In March 2002 Dr. Goldstein diagnosed Plaintiff with three plantar warts on the right foot, plantar fasciitis, bilateral, irritation to the left heel from orthotics, and chronic fatigue syndrome causing generalized and amplified lower extremity myositis, muscle spasms and arthralgia, bilaterally.  (TR 143).  Dr. Goldstein stated in a March 8, 2002 letter that he was referring Plaintiff to pain management and "[u]ntil she is examined by a pain management specialist and a diagnosis and treatment options are made" it is his opinion "that this patient is completely disabled."  (TR 142).  On March 11, 2002 Dr. Goldstein also diagnosed Plaintiff with pes valgus, metatarsalgia and tibial sesamoiditis, bilaterally.  (TR 141). Dr. Goldstein prescribed orthotics for Plaintiff during this period and readjusted them.  (TR 139).  On May 7, 2002 Dr. Goldstein noted that Plaintiff reported that she "feels that she is improving."  (TR 136).  On June 11, 2002 Plaintiff presented with decreasing pain in the balls of her feet and reported that the "new orthotics are working nicely" however, Dr. Goldstein noted that there may be slight a inversion of the left foot and a lateral wedge would be applied.  (TR 135).

Plaintiff treated with Edward S. Jeffries, M.D., from July 2002 to August 26, 2003 for complaints of foot and back pain.  (TR 65, 154-63).  In September 2002 Dr. Jeffries noted that the foot was unremarkable and nontender with no swelling or ecchymosis and a good range of motion.  (TR 161).  An MRI showed that the feet were normal with only some mild increased fluid in the

joint. (TR 161). In October 2002 Plaintiff reported back pain as a result of the therapist pulling her leg during physical therapy. (TR 161). In March 2003 Plaintiff complained of ongoing back problems and identified an area in the left sacroiliac area and posterior sacroiliac area as the symptomatic area. (TR 159). Dr. Jeffries reported that the area was nontender to palpation and nontender to compression of the pelvis. (TR 159). He concluded she had myofascial low back pain. (TR 159). The doctor stated that he would like to have a bone scan, but Plaintiff did not have insurance so this was "probably not feasible plus she thinks she feels fine." (TR 159). An April 2003 MRI revealed a lateral disc at the L3-4 level which may be displaced in the L3 nerve root. (TR 159). In August 2003 Dr. Jeffries noted that Plaintiff reported that her back pain was unchanged since April 2003. (TR 154). Plaintiff also complained of left chest pain which she thought was a panic attack. (TR 154). Plaintiff was advised to go to the ER if the pain continued. (TR 154). The doctor noted that by the end of the examination "the chest pain had apparently resolved, as had the panic attack." (TR 154). Over the course of treatment, Dr. Jeffries had recommended physical therapy, exercise, orthotics, medication to control pain and over the counter anti-inflammatory medication. (TR 65, 160-63).

Plaintiff reports that she saw Daniel P. Elskens, M.D., on May 21, 2003 for pain and a pinched nerve in her left lower back. (TR 67). Dr. Elskens noted that the MRI revealed "a little degenerative disc disease at L3-4, nothing dramatic in nature and nothing that requires surgical intervention." (TR 172). The MRI also showed facet degenerative changes at L4-5 and L5-S1. (TR 173).

A state agency consultant, Saadat Abbasi, M.D., completed a Physical Residual Functional Capacity Assessment dated September 9, 2003 and concluded that Plaintiff can occasionally lift

and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for six hours of an eight-hour workday, sit about six hours of an eight-hour workday and is unlimited in her ability to push and/or pull with the extremities, including the operation of hand and foot controls. (TR 108). Plaintiff can occasionally climb ramps, stairs, ladders, ropes and scaffolds, balance, stoop, kneel, crouch and crawl. (TR 109). The consultant found her partially credible. (TR 112).

The record shows that Plaintiff treated at Bon Secours Cottage Health Services (Bon Secours) from December 2003 to November 17, 2004 (TR 184-198). December 2003 notes indicate that Plaintiff's panic attacks were stable on Klonopin, she was wearing her orthotics and her foot pain was stable. (TR 197-98). Throughout 2004 Plaintiff reported increased problems sleeping and increased fatigue. (TR 186-90). Plaintiff was diagnosed with fibromyalgia and depression. (TR 186-87, 194-95). On March 16, 2004 Surayya Soares, M.D., at Bon Secours noted that Plaintiff was seen for a rheumatological evaluation. (TR 191-92). Plaintiff reported feeling achy most of the time, having very disturbed sleep at night, feeling physically tired and depressed and being unable to do her routine work. (TR 191). Plaintiff complained of pain in her feet and low back. (TR 191). Dr. Soares noted that after a neurosurgical evaluation, Plaintiff was told that she is not a surgical candidate. (TR 191). Plaintiff was taking Elevil, but not regularly, and also taking B12 injections. Plaintiff discontinued taking Mobic and Klonopin. (TR 191). Upon examination the doctor concluded that Plaintiff "has chronic fatigue, generalized myalgias and tiredness without any clinical evidence of synovitis. Probably, her symptoms are consistent with either fibromyalgia vs. chronic fatigue syndrome." (TR 192). The doctor recommended tests to rule out any systemic disease and advised Plaintiff to take Elevil regularly. (TR 192). He encouraged her to exercise. (TR 192).

In November 2004 Plaintiff complained of depression and reported taking Paxil 10 mg half a pill instead of an entire pill. (TR 184, 185). Plaintiff complained of very bad pain in the left foot and the examiner noted tenderness with deep pressure on the medial side of the foot. (TR 184).

### *Mental Health*

Plaintiff testified that in 2000 she checked into a psychiatric hospital for one week after having a nervous breakdown while working at a jewelry store. (TR 236). Plaintiff also reports that she received outpatient treatment for five days at a hospital for stress and anxiety in October 2000. (TR 67). She reports that she was treated with counseling and anti-depressant medication. (TR 67). The record contains a letter dated October 17, 2000 from Nancy Ball Strachan, Ph.D asking Plaintiff's employer to accommodate Plaintiff's need for "a few days away from the workplace" to relieve significant work-related stress. (TR 134). Plaintiff testified that she takes Elavil and Ativan for her depression and anxiety. (TR 237).

An October 9, 2003 letter from Talia Karmo Al-Hamando, Ph.D., LLP, MSW, CSW, states that Plaintiff had been participating at the Oakland Psychological Clinic since April 23, 2003 and presented with depression, multiple somatic complaints, anxiety, lack of energy and anger. (TR 164). She was diagnosed with Dsythymic Disorder 300.4 and Substance Abuse in Remission 304.80 and was taking Lexapro 10 mg and Remeron 15 mg. (TR 164). Dr. Al-Hamando reported that Plaintiff was "making good progress, able to cope and manage her feelings with depression." (TR 164). Plaintiff testified that she saw Dr. Al-Hamando about every two weeks for two years and she stopped treating with her because the therapist and the psychiatrist had other full-time jobs and it was difficult to schedule appointments with them. (TR 223-38).

State agency medical consultant Matthew Rushlau, Ed.D., completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique form dated October 22, 2003. (TR 115-33). The consultant concluded that Plaintiff was "somewhat limited by her emotional problems, but her limitations are only moderately severe and do not prevent her from gainful employment completing unskilled tasks." (TR 131). The consultant noted that Plaintiff "seems to be limited in some ways by her problems," yet was able to function in an independent manner, lives alone and is responsible for her household. (TR 131). The consultant found moderate limitations in some areas of functioning, but no marked limitations. (TR 129).

Plaintiff testified that she treats with Sylvia Hanson, M.D., for depression and anxiety. (TR 237). Dr. Hanson completed an initial psychiatric evaluation of Plaintiff on March 17, 2005. (TR 210). Plaintiff reported that she stopped taking Wellbutrin due to GI upset and stopped Seroquel alleging that it made her have "bizarre" thoughts. (TR 210). Plaintiff reported feeling exhausted and depressed, not sleeping well, being irritable, struggling to function day to day and having a fluctuating appetite. (TR 210). Dr. Hanson noted upon examination that Plaintiff was cognitively alert and her memory was "good" with immediate, recent and remote recall. (TR 212). Dr. Hanson diagnosed Major Depressive Disorder, recurrent and severe, 296.33. (TR 213). She recommended medication management and monitoring, including trying Cymbalta 30 mg, continuing outpatient psychiatric intervention and supportive psychotherapy and/or case management services. (TR 213).

On June 23, 2005 Dr. Hanson completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) form, an Affective Disorders Assessment form, and a Mental Abilities Critical for Performing Unskilled Work form. (TR 199-205). Dr. Hanson noted that Plaintiff "deals poorly with job stress which exacerbate (sic) depression symptoms." (TR 199). She noted that

Plaintiff gets agitated and easily frustrated and that interferes with her work relations. (TR 199). Dr. Hanson also noted that Plaintiff had poor or no ability to understand, remember and carry out complex and/or detailed job instructions. (TR 200). Dr. Hanson concluded that Plaintiff cannot handle full time work. (TR 200). On the Affective Disorders Assessment form, Dr. Hanson noted that Plaintiff had "moderate" restrictions in activities of daily living, "moderate" difficulties in maintaining social functioning, "marked" difficulties in maintaining concentration, persistence or pace and one to two episodes of decompensation. (TR 202). Dr. Hanson noted the same limitations in a form dated March 6, 2006. Dr. Hanson noted that Plaintiff was "experiencing intolerable side effects to most antidepressant (sic)" including Cymbalta, Zoloft, Wellbutrin, and Prozac. (TR 203, 205). Dr. Hanson noted the side effects again in March 2006. (TR 218).

## ADMINISTRATIVE LAW JUDGE'S DETERMINATION:

The ALJ found that although Plaintiff met the disability insured status requirements through the date of the December 8, 2005 decision, had not engaged in substantial gainful activity since April 10, 2005, and suffered from dysthymia, history of plantar fasciitis of both feet, history of myofascial low back pain and a history of substance abuse in remission, which in combination are considered severe impairments, she did not have an impairment or combination of impairments that met or equaled the Listing of Impairments. (TR 32). Additionally, the ALJ found that Plaintiff's statements about her limitations were not entirely credible. (TR 32). The ALJ found that Plaintiff was not capable of performing her past relevant work. (TR 32). However, the ALJ found that she retained the residual functional capacity to perform a limited range of unskilled light work and that there were a significant number of jobs in the economy which she could perform. (TR 33). Therefore she was not suffering from a disability under the Social Security Act. (TR 33).

**STANDARD OF REVIEW:**

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Commissioner*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

**DISCUSSION AND ANALYSIS:**

Plaintiff's Social Security disability determination was made in accordance with a five step

sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)      she was not presently engaged in substantial gainful employment; and

(2)      she suffered from a severe impairment; and

(3)      the impairment met or was medically equal to a "listed impairment;" or

(4)      she did not have the residual functional capacity to perform her relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her residual functional capacity ("RFC"), age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. *See* 20 C.F.R. § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualification to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff argues that the ALJ's credibility finding, RFC finding and finding that Plaintiff can perform substantial gainful activity are not supported by substantial evidence and are contrary to law. Having reviewed the entire record, the Court is persuaded that the ALJ's decision was supported by substantial evidence for the following reasons.

### *Credibility Determination*

Plaintiff argues that the ALJ failed to engage in a proper credibility determination as required

by the Regulations and SSR 96-7p. Plaintiff argues that the ALJ selectively reviewed the record and did not give appropriate consideration to Plaintiff's subjective complaints, as required in diagnosing chronic fatigue syndrome. Plaintiff argues that SSR 99-2p "recognizes that this particular syndrome [chronic fatigue syndrome] relies upon a patient's self-reported symptoms" and cites the portion of SSR 99-2p which references the CDC definition. SSR 99-2p does not adopt the CDC definition of chronic fatigue syndrome (CFS). On the contrary, SSR 99-2p explains that the Social Security Act and regulations *require* medical signs and laboratory findings *not required* by the CDC definition. Although the Administration acknowledges that the symptoms often constitute a claimant's complaint as reported to the treatment provider, the Administration requires more. "CFS constitutes a medically determinable impairment when it is accompanied by medical signs or laboratory findings, . . . . CFS may be a disabling impairment." SSR 99-2p, 1999 WL 271569. "The Act and regulations further require that an impairment be established by medical evidence . . . not only by an individual's statement of symptoms." SSR 99-2p, 1999 WL 271569.

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters,* 127 F.3d at 531. Credibility assessments are not insulated from judicial review. Despite deference due, such a determination must nevertheless be supported by substantial evidence. *Id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

To the extent the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2). In addition to objective medical evidence, the ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. § 404.1529(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

The ALJ concluded that Plaintiff's subjective complaints were not fully credible. (TR 30). The ALJ cited Plaintiff's physical examinations which were essentially "normal, " including Dr. Schiappacasse's findings in December 2003, February 2004 and December 2004. (TR 29, 30, 177-81). Plaintiff complained of swollen glands but this was only noted on February 19, 2004, when she had a temperature of 99.3. (TR 178). Similarly, Plaintiff's physical examinations at Bon Secours were essentially normal. (TR 30, 191-92). The ALJ cited Plaintiff's March 3, 2004 examination at Great Lakes Physiatrists which was essentially normal and showed "some point tenderness over the left sacroiliac joint." (TR 214-15). The ALJ then properly considered factors other than the objective medical evidence.

Plaintiff argues that the ALJ did not consider her daily activities. However, the ALJ pointed out that Plaintiff was able to engage in substantial gainful activity for more than six months from

October 2004 through April 10, 2005 and lives on her own. (TR 29, 30). The dates of her

employment were *after* her alleged onset date. In her brief, Plaintiff provided a laundry list of her

statements regarding activities of daily living, however, the ALJ did not err in failing to address

every statement and the statements do not contradict the ALJ's finding. (Pl's Br. at 12, docket no.

18). For example, Plaintiff's report that she worries about her "alertness" when driving a car is not

inconsistent with the ALJ's credibility findings and such a statement does not constitute substantial

evidence to support a finding that Plaintiff is disabled. Similarly, her reports that she does not read

much or she falls asleep or loses her place and can't remember what she read, or that she does "not

cook too much" because of the "energy it would take to cook" do not evidence functional limitations

and restrictions due to pain. The ALJ found that Plaintiff's ability to live on her own and

participation in gainful activity for over six months were inconsistent with her statements about her

symptoms, including her fatigue and exertional limitations. (TR 29).

The ALJ also pointed out areas in which Plaintiff responded well to treatment and

medication. (TR 26, 30). Her foot pain was treated with orthotic inserts and in June 2002 she

reported that the pain was decreasing and the orthotics were "working nicely." (TR 135). Although

Plaintiff presented to Dr. Jeffries in July 2002 with complaints of foot pain, treatment was again

conservative including changing the orthotics; in September 2002 Dr. Jeffries noted that the right

foot was unremarkable, nontender, with good range of motion and no swelling or ecchymosis. (TR

161). In March 2003 Plaintiff presented with back pain and Dr. Jeffries noted that Plaintiff had

"been trying to treat this herself with some benefit." (TR 159). Dr. Jeffries advised Plaintiff to

continue with her analgesics and over the counter anti-inflammatories. (TR 159). Although Dr.

Jeffries noted that he would like to get a bone scan, he also noted the Plaintiff "thinks she feels fine."

(TR 159). The ALJ also pointed out that Plaintiff responded well to mental health treatment with Dr. Al-Hamando in 2003[1]. (TR 30). The ALJ's credibility determination is supported by substantial evidence in the record.

### *Whether the ALJ's RFC is Supported By Substantial Evidence and the Treating Physician Doctrine*

Plaintiff argues that the ALJ's RFC ignores substantial opinion evidence provided by treating physicians Dr. Schiappacasse and Dr. Hanson and neither the RFC nor the hypothetical question to the VE adequately described Plaintiff's mental limitations.

Dispositive administrative findings relating to the determination of a disability and Plaintiff's RFC are issues reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e). The ALJ "is not required to accept a treating physician's conclusory opinion on the ultimate issue of disability." *Maple v. Apfel*, 14 Fed. Appx. 525, 536 (6th Cir. 2001); *see also* 20 C.F.R. § 404.1527(e). Therefore, the ALJ did not err in failing to adopt any physician's designation of Plaintiff as "disabled."

However, it is well settled that the opinions and diagnoses of treating physicians are generally accorded substantial deference. Under 20 C.F.R. § 404.1527(d)(2), the ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable

---

[1]Plaintiff points out that the ALJ stated that there was no indication that Plaintiff returned to Dr. Soares as recommended. However, Plaintiff alleges that the records from Bon Secours are those of Dr. Soares. (Pl's Br. At 7, docket no. 18). Many of the Bon Secours' records do not indicate the treating physician. There is evidence in the ALJ's opinion that he considered the Bon Secours' medical records. Although in at least one citation the ALJ attributed them to Dr. Schiappacasse, the substantive evidence, for example Plaintiff's temperature, is correctly cited. (TR 28). Further, even without considering the ALJ's speculation that Plaintiff did not return to Dr. Soares as advised, as set forth above, there is substantial other evidence on which the ALJ based his credibility determination. Therefore, this is harmless error.

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. The Sixth Circuit has stated that "[i]n general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters*, 127 F.3d at 529-30.

If an ALJ rejects a treating physician's opinion, he must "give good reasons" for doing so in his written opinion. *See* 20 C.F.R. 404.1527(d)(2); *see also* SSR 96-5p and 96-2p. Furthermore, the Sixth Circuit has noted that the ALJ must provide good reasons for the weight given a treating source's opinion. *Wilson v. Comm'r of Social Sec'ty*, 378 F.3d 541, 544 (6th Cir. 2004). The reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (*citing* SSR 96-2p, 1996 WL 374188, at *5).

Plaintiff argues that the ALJ's RFC is inconsistent with a Medical Needs form completed by Dr. Schiappacasse on August 4, 2003. (TR 168). Dr. Shiappacasse opined that Plaintiff could occasionally lift ten pounds, never lift over ten pounds, can stand two hours in an eight hour work day, walk one hour and sit two hours in an eight hour work day. (TR 170). The doctor noted that her "memory worsens with fatigue." (TR 170). Dr. Schiappacasse completed Chronic Fatigue Syndrome Questionnaire forms dated December 2003 and December 2004. (TR 165-67, 174-76). The origin of the forms is not clear. Dr. Schiappacasse affirmatively checked most of the symptomatic items on the forms as applying to Plaintiff.

Plaintiff argues that the ALJ should have adopted Dr. Schiappacasses' opinions. Notably, the doctor did not check mark any "laboratory findings that support a diagnosis of chronic fatigue syndrome." (TR 165). Although the doctor indicated that plaintiff had all four of the specific

medical signs[2] presented on the form and listed in SSR 99-2p, SSR 99-2p requires that one or more of these medical signs be "clinically documented over a period of at least 6 consecutive months" to establish the existence of a medically determinable impairment of CFS.  SSR 99-2p, 1999 WL 271569 *3.

The ALJ specifically discussed the forms and found that although the doctor "checked off numerous physical signs, symptoms, and manifestations of CFS on the form, . . . very few of these were documented in his progress treating notes."  (TR 28, 165-73).  The Court agrees.  The ALJ specifically noted instances in which the doctors's treating notes do not support the categories which Dr. Schiappacasse checked on the forms.  On May 21, 2003 the doctor noted an "unremarkable" review of systems upon examining Plaintiff and recommended that "she should continue to be managed conservatively."  (TR 171).  On February 19, 2004 Plaintiff complained of sore and "swollen glands" occurring as of February 18, 2004.  (TR 178).  Examinations in December 2003 and December 2004 note "normal" lymph nodes in the neck and axillae.  (TR 177). A treating physician's opinion is entitled to  controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques.  The ALJ found that the opinions on the forms were not.  The ALJ properly set forth his reasons for declining to assign these three forms controlling weight.

Plaintiff also argues that the ALJ failed to properly give deference to Dr. Hanson's opinions in a form dated June 23, 2005 and captioned "Mental Abilities Critical for Performing Unskilled Work" which purports to be based on SSR 96-6p.  (TR 204).  The form is of unknown origin.  The

---

[2]"Palpably swollen or tender lymph nodes on physical examination; Nonexudative pharyngitis; Persistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points; . . . ."  (TR 166, SSR 99-2p, 1999 WL 271569 *3).

form asks the physician to check boxes "yes" or "no" in response to Plaintiff's ability to perform the enumerated "basic work-related activities on a sustained basis (8 hours a day, 5 days a week)." (TR 204). Dr. Hanson checked "no" to five of the 14 activities. (TR 204). On the following page, Dr. Hanson provided rationale for the "no" answers. (TR 205). The VE testified that Dr. Hanson's limitations "describe somebody who could not be competitively employed." (TR 199, 248).

The ALJ did not err in finding that most of Dr. Hanson's opinions regarding Plaintiff's ability to work were based on Plaintiff's statements and subjective complaints. (TR 30-31). *See Young v. Sec'ty of Health and Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990) ("The opinion of a treating physician must be based on sufficient medical data."); *Chandler v. Comm'r of Social Sec.*, 124 Fed. Appx. 355, 358 (6th Cir. 2005). The ALJ further addressed Dr. Hanson's statements that Plaintiff was unable to tolerate the medications which Dr. Hanson prescribed. (TR 31, 203, 205). The ALJ noted that this was contrary to information that Plaintiff was able to tolerate Lexapro and Remeron in the past. (TR 31, 164). The ALJ gave good reasons for discounting the weight to be given to Dr. Hanson's June 23, 2005 forms. (TR 199-205).

Finally, with respect to both Dr. Hanson's and Dr. Schiappacasse's opinions, the ALJ's determination that the opinions, as expressed through pre-typed forms, were not entitled to controlling weight was not patently wrong where the ALJ thoroughly discussed the medical evidence throughout his opinion and supported it with substantial evidence. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).

### *Whether the ALJ's Determination That Plaintiff Can Perform Substantial Gainful Activity Is Supported By Substantial Evidence*

The ALJ properly determined Plaintiff's RFC based on all of the evidence of record and found that Plaintiff can perform a limited range of unskilled light work activity. 20 C.F.R. §

404.1546(c). The ALJ is responsible for assessing Plaintiff's RFC based on all of the relevant evidence in the record. 20 C.F.R. § 404.1546(c).

The ALJ found that Plaintiff had the RFC to perform a limited range of unskilled light work with the following limitations: (1) can lift and carry ten pounds frequently, twenty pounds occasionally, (2) can occasionally perform postural activities including climbing, stooping, crouching, balancing, kneeling and crawling, and (3) requires simple job assignments with routine production/stress and occasional contact with supervisors. (TR 32). These limitations are supported by the state agency medical consultant who concluded that Plaintiff was capable of performing light work with postural activities limited to occasional performance. (TR 107-09). The limitations are also consistent with a state agency psychological consultant who concluded that Plaintiff "is somewhat limited by her emotional problems, but her limitations are only moderately severe and do not prevent her from gainful employment completing unskilled tasks. (TR 131).

Plaintiff's argument that her "moderate" mental limitations should have been found to occur "often" and have been included in the RFC is not persuasive. Plaintiff seeks to equate "moderate" as used in the current version of 20 C.F.R. § 404.1520a(c)(3) with that of "often" as used under the old version of that regulation (as both terms fall on the same place in a five-point scale). The Court will not equate "moderate" with "often." *See Butler-Wade v. Comm'r of Soc. Sec.*, 2005 WL 361530 *7-8 (E.D. Mich. 2005).

The language of 20 C.F.R. § 404.1520a and 20 C.F.R., Pt. 404, Subpt. P., App. 1 § 12.00 suggest that a claimant's functional limitations in daily living, social functioning, or concentration/persistence/pace cannot be quantified with mathematical precision. The regulations' language specifically notes that an ALJ is not to examine a claimant's ability to perform and

complete a certain number of tasks but is rather to assess the nature and overall degree of an impairment's interference with a claimant's overall functioning. *See* 20 C.F.R., Pt. 404, Subpt. P., App. 1 § 12.00(C). Plaintiff does not otherwise show how these limitations would preclude work or are contrary to the RFC as determined by the ALJ.

In a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which he finds credible and supported by the record. *See Casey v. Sec'y of Health and Human Serv.,* 987 F.2d 1230, 1235 (6th Cir. 1993). The ALJ's RFC incorporated the limitations he accepted as credible and they were included in the hypothetical question to the VE. The VE testified that Plaintiff would not be able to perform her past relevant work, which demanded more skill than the "unskilled" classification. (TR 245). However, the VE also testified that there were unskilled light jobs that Plaintiff would be able to perform, which numbered about 8,000 in southeastern Michigan and 12,000 statewide. (TR 246). The ALJ properly referenced the regulations, Pt. 404, Subpt. P, App. 2, Rule 202.21, 20 C.F.R. §404.1569 as a framework which would direct a conclusion of "not disabled" and further relied on the VE's testimony to determine what effect Plaintiff's non-exertional limitations would have on the number of jobs available in the economy[3]. His determination that there are a significant number of jobs in the national economy that she can perform is supported by substantial evidence.

**CONCLUSION**

The ALJ's decision is supported by substantial evidence and his decision to deny benefits was within the range of discretion allowed by law. There is simply insufficient evidence for the

---

[3]The ALJ found that Plaintiff was classified as a "younger individual" at the time of the hearing, had a highschool education and had a semi-skilled work history but it was not transferrable because of her limitation to unskilled work. 20 C.F.R. §§ 404.1563, .1564, .1568.

undersigned to find otherwise. Accordingly, Plaintiff's Motion for Summary Judgment (docket no. 18) should be denied, that of Defendant (docket no. 23) granted and the instant Complaint dismissed.

## **REVIEW OF REPORT AND RECOMMENDATION:**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: July 22, 2008                          s/ Mona K. Majzoub
                                              MONA K. MAJZOUB
                                              UNITED STATES MAGISTRATE JUDGE

## **PROOF OF SERVICE**

      I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: July 22, 2008                             s/ Lisa C. Bartlett           
                                                  Courtroom Deputy